UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RUBEN ORTIZ,

        Petitioner,

    v.

SCOTT FRAUENHEIM, Warden,

        Respondent.

No.  1:13-cv-00006-DAD-SKO  HC

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**

Petitioner Ruben Ortiz is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges six grounds for habeas relief: (1) erroneous aiding and abetting jury instructions; (2) erroneous jury instructions on transferred intent and proximate cause; (3) misapplied the *Kelly/Leahy*[1] rules to bar the testimony of Petitioner's ballistics experts; (4) *Griffin*[2] error in the prosecutor's arguments to the jury; (5) ex parte communications between the trial judge and a juror; and (6) cumulative error.  Having reviewed the record as a whole and applicable law, the undersigned recommends that the Court deny the petition.

## I.    <u>Factual Background</u>[3]

On the afternoon of March 5, 2008, Jesus Vargas, Josie Canel, and Petitioner were hanging out at the apartment of their friend, Lulu.  Petitioner was a member of the Floradora

---

[1] *People v. Leahy*, 8 Cal. 4th 587 (1994); *People v. Kelly*, 17 Cal. 3d 24 (1976), superseded by statute as recognized in *People v. Wilkinson*, 33 Cal. 4th 821 (2004).
[2] *Griffin v. California*, 380 U.S. 609 (1965).
[3] The factual background is derived from the factual and procedural history set forth in *People v. Ortiz*, 2012 WL 1652888 (Cal.App. May 11, 2012) (No. F060792).

Street Bulldogs.  When Lulu's daughter, Celeste, who was about nine years old, needed something from Walgreens, Vargas drove Petitioner, Canel, and Celeste there in Vargas' car.

As Vargas drove down Hammond Avenue, the group saw an Asian man dressed in blue[4] standing outside an apartment complex at 4336 East Hammond Avenue (the Hammond apartments), throwing gang signs, and "mad-dogging" them.[5]  Canel testified that mad-dogging meant "looking at you ugly," that is, threatening them.  She identified the man as Chrisna Long, whom she thought was a member of the Asian Crips.  Although Ortiz did not respond aggressively, he was upset that a rival gang member would try to provoke an altercation when there was a child in the car.

When Petitioner and his friends passed the same spot on their return from the store, Long was in the same place and had been joined by more Asian men.  Vargas and Petitioner dropped Canel and Celeste at Lulu's house.  Petitioner returned to Lulu's house about 15 minutes later.

Celeste testified that when they went to the store, she saw Asian people outside the Hammond apartments, playing dice and staring at the car.  As Celeste returned home in Vargas' car, one Asian man lifted his shirt to show his tattoo, and others flashed gang signs.  In an early interview, Celeste said that Petitioner waved something red out of the window; later, she said that Vargas put something red on his shoulder.

While resident Donovan Pullen was smoking a cigarette on the balcony of his second floor apartment, he witnessed an interchange between an Asian man in the garage area of the Hammond apartments and a Hispanic man across the street.  The Asian man said something like, "What's up cuz?"  The Hispanic man replied, "I'm not a Crip: I'm not a cuz."  Pullen described the Asian man as confrontational, making gang gestures and pulling out a firearm.  At that point,

---

[4] The Asian Boyz gang colors were blue; the Bulldog gang colors were red.
[5] The record reveals substantially more testimony concerning the gang-related circumstances of the crime than is reflected in the state court's brief factual summary.

"a whole lot" of shots were exchanged, with the first shot coming from the Hammond apartments area and the Hispanic man shooting back.  Pullen reported hearing both 9 mm shots, which sounded like loud gunshots, and .22-caliber shots, which sounded like firecrackers.  He thought that the Asian man had a 9 mm or .40 caliber Glock and the Hispanic man had a "machine gun, pistol, a TEC-9 or something like that."  When the gunfire ended, the Asian man was lying on the ground, and the Hispanic man ran away.  A group of Asian men came out of the Hammond apartments parking lot, got into a car, and drove away.

James Tep, a member of the Asian Boyz and friend of the victim, was hanging out in the Hammond apartments parking lot that afternoon.  He saw the same car pass by at least three times and witnessed an "exchange of looks" between a passenger and a person or persons in front of the Hammond apartments.  Tep remembered that a bandana was waived from the car but could not recall if it was waved by the driver or the passenger.  He identified Petitioner as one of the men in the car.

Tep was in the courtyard of the Hammond apartments when he heard gunshots.  As Tep ran back to the garage area, he encountered four individuals, two of whom he recognized as Asian Boyz members, running toward the courtyard.  He saw Long on the ground in the parking lot, and Petitioner and another man shooting from the other side of the street.  Tep ran to the courtyard to hide and then left in a friend's car.

Wendy Montoya lived on Olive near Rowell.  At about 5:00 p.m., Petitioner, who was a family friend of Montoya's boyfriend, knocked on her door and entered through a sliding glass door.  Petitioner, who was nervous and jumpy, asked Wendy to drive him to his mother's house, which was on the same block as Lulu's house.  Petitioner told Montoya that "they were arguing" and "he tried to cap me."

///

3

At about 5:45 p.m., Fresno police officers responded to a call about a possible shooting on North Rowell Avenue, just north of Olive Avenue.  On arrival, they discovered the victim lying face down in the parking lot of the Hammond apartments.  His right hand held a 9 mm Beretta handgun with an extended capacity magazine.  The victim, later identified as 15-year-old Chrisna Long, had gunshot wounds in his head and right chest.  The head wound was fatal.  Long had "Asian Boyz" tattooed on his chest.

Expended cartridge cases and live cartridges were scattered in the garage area and on a walkway that connected the garage to the parking lot.  The officers observed multiple bullet holes in the garage doors and a bullet strike mark on the garage door hinge, and found deformed copper-jacketed bullets and fragments in both garages.  Across Rowell Street, the officers found five expended 9 mm cartridge cases and observed bullet marks on the wall of the apartment building.

In Montoya's garage, police officers found a Taurus 9 mm semi-automatic handgun, a Glock 9 mm semi-automatic handgun, a high-capacity magazine, and a magazine with 14 live cartridges.  After witnesses reported seeing an individual who had been with Long run into an apartment in the Hammond apartments, police searched the apartment and recovered a Bryco 9 mm semiautomatic handgun.

## II.    **Procedural Background**

Following trial in March 2010, a jury found Petitioner guilty of second degree murder and found true the following enhancements: (1) committing an offense for benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)); (2) personally discharging a firearm resulting in death (Cal. Penal Code § 12022.53(d)); and (3) being a principal in the murder, and any other principal did personally discharge a firearm causing death (Cal. Penal Code § 12022.53(b), (c), and (e)(1)).

///

On July 26, 2010, Petitioner moved for a new trial, alleging (1) juror misconduct; (2) the trial court's violation of its duty of impartiality; and (3) prosecutorial misconduct.  After conducting a two-day hearing, the trial court denied the motion on August 10, 2010.

Petitioner was sentenced to an indeterminate term of 15 years to life for the murder, plus a consecutive term of 25 years to life for personally discharging a firearm and proximately causing death in the commission of a felony (Cal. Penal Code § 12022.53(d)).

Petitioner filed a direct appeal to the California Court of Appeal, Fifth District.  On May 11, 2012, the Court of Appeal affirmed the judgment, and Petitioner moved for rehearing.  The Court of Appeal denied the motion for rehearing on June 4, 2012.  The California Supreme Court summarily denied the petition for review on August 15, 2012.

On January 2, 2013, Petitioner filed the habeas petition in this Court.

### III.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

1

2     (1) resulted in a decision that was contrary to, or involved an unreasonable
      application of, clearly established Federal law, as determined by the Supreme Court of
3     the United States; or

4     (2)  resulted in a decision that was based on an unreasonable determination of the
      facts in light of the evidence presented in the State court proceeding.
5

6     28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*,
      529 U.S. at 413.

7
      "By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state
8
      court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v.*
9
      *Richter*, 562 U.S. 86, 98 (2011).
10

11    As a threshold matter, a federal court must first determine what constitutes "clearly

12    established Federal law, as determined by the Supreme Court of the United States." *Lockyer*,

13    538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the

14    Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must

15    then consider whether the state court's decision was "contrary to, or involved an unreasonable

16    application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited

17    clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the

18    result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court

19    must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*,

20    537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the

21    state court is contrary to, or involved an unreasonable application of, United States Supreme
22
      Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).
23

24    "A federal habeas court may not issue the writ simply because the court concludes in its

25    independent judgment that the relevant state-court decision applied clearly established federal

26    law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that

27    a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'
28

on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

## IV.    Grounds One and Two: Jury Instructions

Using the petition for review that he filed with the California Supreme Court,[6] Petitioner contends that the trial court gave the jury incorrect instructions on (1) aiding and abetting and (2) transferred intent and proximate cause.  Respondent counters that because these grounds raised only questions of state law, neither ground is cognizable in a federal habeas proceeding.

### A.    Federal Habeas Review of Jury Instruction Errors

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review.  "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "[A] petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

To prevail in a collateral attack on state court jury instructions, a petitioner must do more that prove that the instruction was erroneous.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72.  Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

---

[6] The petition for writ of habeas corpus does not allege specific grounds for relief, but simply incorporates by reference the grounds alleged in the petition for review submitted to the California Supreme Court.

A federal court's review of a claim of instructional error is highly deferential. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole. *Id.* The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72).

Even when the trial court has made an error in the instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

**B.    Aiding and Abetting**

**1.    The Instructions**

Petitioner's requested jury instructions included the aiding and abetting instructions set forth in CALCRIM Nos. 400 and 401. 4 CT 952. The prosecution did not request those instructions. 4 CT 958. In the charge conferences at the close of trial, Petitioner's counsel was undecided as to whether he sought inclusion of the aiding and abetting instructions. Just prior

to closing arguments and jury instructions, the defense withdrew its request for CALCRIM Nos.

400 and 401.  13RT3039.

Nonetheless, the trial court presented jury instructions including instructions drawn from

CALCRIM Nos. 400 and 401:

> A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator who directly committed the crime.  A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.
>
> To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that, the perpetrator committed the crime; Two, the defendant knew that the perpetrator intended to commit the crime; Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.
>
> If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abetter.
>
> A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed.  To withdraw, a person must do two things:
>
> One, he or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating.  That notification must be made early enough to prevent the commission of the crime;
>
> And two, he or she must do everything reasonably within his or her power to prevent the crime from being committed.  He or she does not have to actually prevent the crime.
>
> The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw.  If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory.
>
> 14 RT 3326:16-3328:5.

The Court also instructed the jury on mutual combat (CALCRIM No. 3471).  These instructions included the language, "A fight is mutual combat when it began or continued by mutual consent or agreement.  That agreement may be expressly stated or implied and must occur before the claim of self-defense arose."  14 RT 3342:26-3343:3.

Petitioner did not object to the trial court's inclusion of these instructions.

## 2.   State Court Decision

Despite Petitioner's failure to object to the instructions, the Court of Appeal addressed this claim on the merits.  *Ortiz*, 2012 WL 1652888 at *6 n. 6.  As he does in his federal petition, Petitioner argued "that there was insufficient evidence to support a finding that other persons intended to kill Long or that [Petitioner] intended to aid and abet them in carrying out that intent."  *Id.* at *7.  Citing *People v. Sanchez*, 26 Cal. 4th 834 (2001), the prosecution contended that a defendant can be "considered an aider and abetter of a rival gang member where the defendant and his rival engage in a public gun battle that leads to death."  *Ortiz*, 2012 WL 1652888 at *7.

In *Sanchez*, the California Supreme Court held that where two rival gang members engaged in a shoot-out that resulted in the death of an innocent third party struck by a stray bullet, each could be charged and convicted of murder, even though the victim was killed by only a single bullet.  26 Cal. 4th at 838-39.  The Court upheld Sanchez' conviction, reasoning that even though the individual who fired the killing shot could not be determined, each defendant's participation in the life-threatening shooting constituted a proximate cause of the victim's death.  *Id.* at 848-49.

After analyzing the *Sanchez* decision and the cases on which the *Sanchez* Court relied, the Court of Appeal in this case concluded that:

///

10

> [W]here rival gang members engage in mutual combat, each gang member's conduct may be viewed as inciting and encouraging the other's (or others') conduct.  Consequently, each gang member may be liable as an aider and abettor for any death caused by the mutual combat."

*Ortiz*, 2012 WL 1652888 at *8 (footnote omitted).

### C.    No Federal Constitutional Error

The jury instructions in this case were complete and accurately expressed California precedent concerning the liability of a defendant for a death resulting from a deadly battle between two rival criminal street gangs.  Petitioner, whose defense attempts to assign liability for Long's death solely to an unidentified member of the Asian Boyz, seeks to have this Court overrule a California court's application of California law.  This Court is bound by the state court's determination of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).   The Court should decline to address grounds one and two, which are questions of state law not cognizable in federal habeas proceedings.

## V.    Exclusion of Expert Testimony

As his third ground for habeas relief, Petitioner alleges that the trial court erred in excluding proffered expert testimony regarding the likely caliber of the shot that killed Long, based on the expert's shooting bullets into a pig head.  Respondent contends that the Court should not address this issue in the absence of a U.S. Supreme Court decision establishing rules to evaluate the constitutionality of a state court's application of state evidentiary rules.

### A.    State Court Proceedings [7]

Seeking to prove that Long was killed by a .22 caliber bullet fired by an Asian Boyz gang member, Petitioner sought to introduce the trial testimony of experts Stebens and Zachary, who had conducted experiments to determine the size of the entry wounds created by .22 caliber and 9 mm weapons.  Stebens was prepared to testify that Long's entrance wounds were more consistent with his having been shot with a .22 caliber weapon.  The prosecution moved for a pretrial hearing pursuant to California Evidence Code § 402 to exclude the testimony under *Kelly*, 17

---

[7] The factual and procedural background relevant to this issue is derived from that set forth in *Ortiz*, 2012 WL 1652888.

1   Cal.3d 24.  Finding that Stebens and Zachary had failed to establish that their testing method was

2   generally accepted within the scientific or technical community, the trial court determined that the

3   testimony was not admissible.  The trial court reiterated its holding in the course of trial, adding

4   that the experiments were likely to confuse the jury and consume an undue amount of time.

5          The Court of Appeals concluded that the trial court's determination was within its

6   discretion.  It added:

> [Petitioner] also claims that the trial court's evidentiary ruling infringed upon his constitutional right to present a defense.  We are not persuaded.  His claim is premised on the assumption that he could not be convicted of murder if Long's fellow gang members fired the fatal bullet, but as demonstrated by *Sanchez, supra*, 26 Cal.4th 834, and our discussion above on aiding and abetting, this assumption is incorrect.  To the contrary, determining whether [Petitioner] fired the fatal shot was neither necessary or sufficient for a murder conviction.

> *Ortiz*, 2012 WL 1652888 at *11.

### B.   State Law Issues Uncognizable in Federal Habeas Proceedings

14         As already stated in the discussion of claims one and two, "It is not the province of a

15   federal court to reexamine state court determinations of state law questions."  *Estelle*, 502 U.S. at

16   71-72.  Issues regarding the admission of evidence are particularly matters of state law, generally

17   outside the purview of a federal habeas court.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th

18   Cir. 2009).  "The admission of evidence does not provide a basis for habeas relief unless it

19   rendered the trial fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d

20   926, 930 (9th Cir. 1995).

21         "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned

22   review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6

23   (1983).  "Although the [U.S. Supreme] Court has been clear that a writ should be issued when

24   constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at

25   375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

26   evidence constitutes a due process violation sufficient to warrant issuance of the writ."  *Holley*,

27   568 F.3d at 1101.  Since the state appellate court's disposition of Petitioner's appeal was not

28   ///

contrary to or an unreasonable application of Supreme Court precedent, a federal district court should not reach ground three.

## VI.    *Griffin* Error

In three-sentences, Petitioner contends in ground five that the Court should reverse the Court of Appeal's *Griffin* analysis as incorrect.  Petitioner provides no further guidance, not even providing a full citation of the *Griffin* decision, and simply refers this Court to the state court's slip opinion.  Respondent counters that the state court's decision was not unreasonable.

### A.    State Court Decision

The Court of Appeal addressed this issue as follow:

> In his rebuttal statement to the jury, the prosecutor said:
>
>> "Motive.  Motive is not an element of the crime charged and need not be shown, however, you may consider motive or lack of motive as circumstances in this case. Presence of motive may tend to establish the defendant is guilty.  We've got motive out the wazoo.  Evidence—absence of motive may tend to show the defendant is not guilty.   And there is absolutely no reason for the defendant to have done this other than gang.
>>
>> "The *defendant* won't address gang-related content.  And that is the issue in this case.  If it is not gang-related, then the defendant's actions were fully justified self-defense, because Long was bringing his gun up and he [Petitioner] killed him because he had to.  Plain and simple." (Italics added.)
>
> At this point, defense counsel raised an objection based on *Griffin [v. California*, 380 U.S. 609 (1965)] error, which defense counsel described as "[i]nadvertent" but error nonetheless.  After a brief discussion outside the presence of the jury (which was not recorded by the court reporter), the court told the jury:
>
>> "The Court would like the record to reflect that throughout the closing arguments, both by the People and the defense, there have been Power Point presentations presented for the jurors' convenience.  The current slide shown by the People reads at the top, "Why won't defense address if D's conduct was gang-related."
>>
>> "When [the prosecutor] spoke of that . . . display a moment ago, he misspoke.  I want to make it very clear to the jury by rereading the instruction that applies, as I had given it to you earlier in this case.

"A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

The prosecutor then continued his rebuttal argument. He corrected his previous statement saying, "Rebuttal is addressing *counsel's* closing argument. Counsel made no reference to the defendant's gang conduct . . . . " (Italics added.)

On appeal, [Petitioner] contends that reversal is required based upon the prosecutor's initial statement that "defendant won't address the gang-related conduct." We disagree. *Griffin* holds that the privilege against self-incrimination of the Fifth Amendment prohibits any comment by the prosecution on a defendant's failure to testify at trial that invites or allows the jury to infer guilt therefrom." (*People v. Roybal* (1998) 19 Cal.4th 481, 514.) On the other hand, a prosecutor is permitted to comment on the state of the evidence and on "the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Vargas* (1973) 9 Cal.3d 470, 475, citations omitted.) "We apply a 'reasonable likelihood' standard for reviewing prosecutorial remarks, inquiring whether there is a reasonable likelihood that the jurors misconstrued or misapplied the words in question." (*People v. Roybal*, *supra*, at p. 514.)

Here, it is not reasonably likely that the jury would have understood the prosecutor as inviting the jury to infer guilt based on [Petitioner's] failure to testify. As the trial court noted, the Power Point slide that accompanied the prosecutor's argument read, "'Why won't *defense* address if D's conduct was gang-related.'" (Italics added.) This was a permissible comment on the state of the evidence. The prosecutor simply misspoke, referring to the "defendant" instead of "the defense" or "defense counsel." Even defense counsel recognized that the statement was inadvertent. After defense counsel objected, the trial court immediately explained to the jury that the prosecutor had misspoken and admonished that the defendant had the right not to testify. The prosecutor then corrected himself. Under these circumstances, the jury would not have taken the prosecutor's initial statement to mean that it could use [Petitioner's] failure to testify as evidence of his guilt.

Further, even assuming the jury understood the prosecutor's misstatement as a comment on [Petitioner's] failure to testify, there was no prejudice. The trial court immediately admonished the jury that defendant had "an absolute constitutional right not to testify" and repeated the instruction, "Do not consider for any reason at all the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way." We presume that the jury followed these instructions.

1

2

(*People v. Dement* (2011) 53 Cal.4[th] 1, 50 [finding no prejudice under any standard where trial court instructed jury not to draw any inference from fact that defendant does not testify].)

3

*Ortiz*, 2012 WL 1652888 at *12 (footnotes omitted).

4

**B.     Commenting on Defense Case**

5

In state criminal proceedings, the 14th Amendment to the U.S. Constitution "forbids either

6

comment by the prosecution or instructions by the court that [a defendant's] silence is evidence of

7

guilt." *Griffin*, 380 U.S. at 615.  *See also Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)

8

("*Griffin* prohibits the judge and prosecutor from suggesting to the jury that it may treat the

9

defendant's silence as substantive evidence of guilt").

10

The *Griffin* rule does not bar comment on the sufficiency of the defendant's evidence,

11

however.  In a case in which defense counsel had repeatedly charged that "the Government had

12

unfairly denied [the defendant] the opportunity to explain his actions," the prosecutor's statement

13

that respondent could have explained his story to the jury was admissible as fair response to

14

defense counsel's argument.  *United States v. Robinson*, 485 U.S. 25, 27, 34 (1988).  Similarly,

15

where defense counsel focused the jury's attention on the contemplated defense by referring in

16

the opening statement to the version of the facts that defendant's testimony would show and by

17

later indicating that the defendant would be the next witness, the prosecutor's references in his

18

closing to the state's "unrefuted" and "uncontradicted" evidence did not constitute an

19

impermissible reference to the defendant's 5th and 14th amendment right not to testify.  *Lockett v.*

20

*Ohio*, 438 U.S. 586, 595 (1978).

21

Noting that even defense counsel recognized that the prosecutor had simply misspoken,

22

the Court of Appeal here found the jury was unlikely to have interpreted the objected-to reference

23

as encouraging it to find the defendant guilty because he did not testify.  It added that the trial

24

court had promptly explained the misstatement, referring to the permissible language of the

25

corresponding Power Point slide and repeating the jury instruction concerning Petitioner's right

26

not to testify. The prosecutor then corrected himself.  In light of these facts, the Court of Appeal

27

determined the statement to constitute a "permissible comment on the state of the evidence."

28

*Ortiz*, 2012 WL 1652888 at *13.

1    Under these circumstances, fairminded jurists could conclude that the Court of Appeal's

2  decision was neither contrary to relevant Supreme Court precedent nor unreasonable.

3  Accordingly, the Court should decline to treat the prosecution's misstatement in its closing

4  argument as a basis to grant habeas relief under 28 U.S.C. § 2254(d).

5  **VII.**   **Juror Misconduct**

6    Petitioner contends that the trial court erred in (1) denying his motion for a new trial based

7  on the trial court's *ex parte* communication with a juror, James Oppliger, then a sitting judge of

8  the Fresno County Superior Court, and (2) failing to disclose the communication until after the

9  jury had rendered its verdict.  He argues that the trial court should have recused itself on its own

10  motion and that, by failing to disclose the *ex parte* communications during trial, the trial court

11  denied his right to counsel and his right to be present at all critical stages of the proceedings.

12  Respondent counters that the state court's decision was neither contrary to established federal

13  case law nor unreasonable.

14    **A.**   **Factual Background**

15    The California Court of Appeal summarized the background of this issue:

16
17
18
> One of the jurors, referred to as Juror No. 10, was also a judge on the Fresno County Superior Court.  At a hearing called by the trial court on April 15, 2010 (three days after the jury had reached its verdict)), the court advised counsel that it had received e-mail communication from Juror No. 10 during the trial:

19
20
21
22
23
24
25
26
> "In this courthouse, my name appears on a number of mass e-mail lists which I and my colleagues use to facilitate communication. One such list is used to learn which if any of us is available to meet for lunch.  On three occasions during [Petitioner's] trial, former Juror [No.] 10, when responding to a lunch request, replied to everyone on the judicial contact list, which included me.  These communications were uninvited and unanswered by this judicial officer.  Further, the communications in no way influenced this Court in its duty to ensure [Petitioner] a fair trial.  This Court viewed each communication as nothing more than an innocuous attempt at humor.  Since none amounted to a violation of the Court's admonition to not talk about the case, I simply ignored them.  But because the e-mails were in fact a type of ex parte communication, I feel disclosure is warranted.

27
28
> The trial court then provided counsel with copies of the e-mails sent by Juror No. 10.  Because only Juror No. 10's messages were provided and not the preceding messages from other correspondents, the trial court offered some context.

A series of e-mails dated March 15, 2010, began with a lunch inquiry and the presiding judge remarked that judicial officers must not discuss any aspect of the case with Juror No. 10. In response, Juror No. 10 wrote back, "while it behooves us to be responsible and even to [err] on the side [of] caution, other subjects such as the process fall outside the admonishment but more importantly fall outside [the] scope of common sense."

An unidentified correspondent observed that Juror No. 10 had defended, prosecuted, presided over, and would now hear as a juror a homicide case and he needed to handle an appeal, commit a homicide, and be the victim of homicide to see all sides of such a case. In an e-mail dated March 16, 2010, Juror No. 10 responded in part, "here I am livin' the dream, jury duty with [defense counsel] Mugridge and [prosecutor] Jenkins!" In response to another lunch inquiry, a colleague mentioned that Juror No. 10 would be taking a "field trip," referring to the jury view of the scene of the crime. In an e-mail dated April 7, 2010, Juror No. 10 responded, "I am still watching you guys."

Finally, on April 12, 2010, Juror No. 10 sent an e-mail to an address list titled "Superior Court Judges." He wrote, "Does anyone have the 'top ten reasons that you know you have been on a jury [too] long when . . .'" He asked that the list be sent to his clerk and explained, "My friends want a copy."

On July 26, 2010, defense counsel filed a motion for a new trial. Among other arguments, defense counsel argued that Juror No. 10 engaged in three types of misconduct: (1) he concealed his bias during jury selection; (2) he engaged in ex parte communication with the trial court by sending e-mails to 22 superior court judges, including the trial court judge; and (3) he showed impatience and a lack of seriousness when he slammed a book down loudly and dramatically during defense counsel's questioning of an expert witness.

In support of the claim of concealed bias, Josie Canel, a witness in the trial and a friend of Ortiz, provided a declaration. She stated that she was sitting outside the courtroom during jury selection when she saw a White man leave through the jury door. He was talking on a phone and said, "'It was a Hispanic gang member with a gun, what do you expect. If a Hispanic gang member with a gun walked into a liquor store you would expect him to rob it. He says he's guilty.'" Later, when she testified in court, she saw the same man on the jury. On June 4, 2010, she identified Juror No. 10 as the juror she had overheard talking about Hispanic gangs.

The trial court heard testimony from nine witnesses, including Canel and Juror No. 10. On August 10, 2010, the court denied the motion for a new trial, concluding, "The Court is satisfied that [Petitioner] received a fair trial before 12 impartial jurors and before an impartial member of the bench."

*Ortiz*, 2012 WL 1652888 at 13-14.

**B.**     **State Court Determination**

      **1.**     **Recusal**

In California, the statutory basis for disqualifying a judge is set forth in California Code of Civil Procedure § 170.1.  "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding."  Cal. Code of Civil Procedure § 170.3(d).  The Court of Appeal held that because Petitioner had not followed the statutory procedural rules, he had forfeited his statutory claim.  As a result, his sole remedy rested on a due process right to a fair and impartial judge.

Petitioner contended that to satisfy "the appearance of justice," due process requires recusal even when the judge has no actual bias.  *In re Murchison*, 349 U.S. 133, 136 (1955).  The state court rejected his argument, relying on precedent indicating that cases involving the appearance, but not a probability, of bias should be resolved under the disqualification statutes and codes of judicial conduct.

Noting that the trial judge never responded to the juror's e-mails and that the e-mails themselves neither commented on the substance of the trial nor revealed juror bias or prejudgment, the state court found no probability of judicial bias.  It concluded that "the facts do not objectively suggest doubts as to the trial court's impartiality."  *Ortiz*, 2012 WL 1652888 at *15.

      **2.**     **Ex Parte Communication**

Petitioner claimed that Juror No. 10's e-mails and the trial judge's failure to disclose them, deprived him of his right to counsel and his right to be present at all critical stages of trial proceedings.

The Court of Appeal acknowledged that *ex parte* communications between jurors and the trial judge are generally improper since the defendant is entitled to "an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection." *People v. Clark*, 52 Cal. 4th 856, 985-86 (2011).  "Although such communications violate a defendant's right to be present, and represented by counsel, at all critical stages of his trial , and thus

18

1   constitute federal constitutional error, reversal is not required where the error can be

2   demonstrated harmless beyond a reasonable doubt." *Id.* at 987.  In addition, "[n]ot every

3   communication between the judge and jury constitutes a critical stage of trial." *Id.  Ex* parte

4   communication is harmless error when the calls were made for scheduling or other administrative

5   purposes.

6     The state court found that the challenged e-mails were addressed to many recipients.

7   They were brief, and none of them referred to the substance of the case.  Juror No. 10 admitted

8   that he had carelessly sent the e-mails without considering that the trial court would be included

9   among the recipients.  The trial court did not respond to the e-mails; Juror No. 10 did not seek

10  one.  In the absence of a judicial response and of any expectation of a response, the

11  correspondence did not require defendant to be granted an opportunity to evaluate it.  No

12  evidence supported a conclusion that the correspondence had any effect on the conduct of the trial

13  or the outcome of the case.  The state court concluded that the "e-mails were harmless beyond a

14  reasonable doubt." *Ortiz*, 2012 WL 1652888 at *16.

15    **C.**  **Due Process: Recusal**

16    "'The Due Process Clause of the Fourteenth Amendment establishes a constitutional floor,

17  not a uniform standard,' for a judicial bias claim." *Hurles v. Ryan*, 752 F.3d 768, 788 (2014)

18  (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)).  "While most claims of judicial bias are

19  resolved by common law, statute, or the professional standards of the bench and bar, the floor

20  established by the Due Process Clause clearly requires a fair trial in a fair tribunal before a judge

21  with no actual bias against the defendant or interest in the outcome of the particular case."

22  *Hurles*, 752 F.3d at 788 (internal quotations omitted).  "A fair trial in a fair tribunal is a basic

23  requirement of due process." *Murchison*, 349 U.S. at 136.  Nonetheless, "most matters relating to

24  judicial disqualification [do] not rise to a constitutional level." *Federal Trade Comm'n v. Cement*

25  *Inst.*, 333 U.S. 683, 702 (1948).

26    Recusal is required in those circumstances "in which experience teaches us that the

27  probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable."

28  *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 877 (2009).  In making this analysis, a

1    court does not evaluate the actual judge harbored subjective bias but whether "the average judge

2    in her position was likely to be neutral or whether there existed an unconstitutional potential for

3    bias." *Hurles*, 752 F.3d at 789.  Put another way, the court must consider "whether 'under a

4    realistic appraisal of psychological tendencies and human weakness, ' the [judge's] interest 'poses

5    such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of

6    due process is to be absolutely implemented.'"  *Id.*, citing *Caperton*, 556 U.S. at 883-84 (quoting

7    *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  The "risk of unfairness has no mechanical or static

8    definition.  It 'cannot be defined with precision' because '[c][i]rcumstances and relationships must

9    be considered."  *Hurles*, 752 F.3d at 789 (quoting *Murchison*, 349 U.S. at 136).

10         Under this standard, reasonable jurists could differ on the question of whether the trial

11    judge should have recused himself.  Where reasonable jurists could reach different conclusions,

12    this Court should not grant habeas relief.

13              **D.     Failure to Disclose E-mails Before Verdict**

14         Disclosure of *ex parte* communications between a judge and juror is generally necessary

15    when the communication relates to an aspect of the trial.  *Rushen v. Spain*, 464 U.S. 114, 119

16    (1983).  In the absence of disclosure, the prejudicial effect "can normally be determined by a

17    post-trial hearing.  *Id.*  "[T]he factual findings arising out of the state courts' post-trial hearings

18    are entitled to a presumption of correctness." 28 U.S.C. §2254(d);  *Rushen*, 464 U.S. at 120;

19    *Sumner v. Mata*, 449 U.S. 539, 547 (1981).

20         Because the juror's correspondence in this case did not relate to any aspect of the trial, the

21    *Rushen* holding does not mandate disclosure.  In any event, the trial court disclosed the

22    communications following trial and conducted a hearing in response to Petitioner's motion for a

23    new trial.  The state court's resolution of that hearing is entitled to a presumption of correctness.

24    This Court should not grant habeas relief based on the trial court's determination to disclose the

25    communications following return of the verdict.

26    **VIII.   Cumulative Error**

27         If the Court agrees with the undersigned's conclusion that none of Petitioner's claims

28    constitute error, it need not reach Petitioner's claim of cumulative error.

## IX.     Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>     (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
>     (B)  the final order in a proceeding under section 2255.
>
>     (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
>     (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate

///

"something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication.  Accordingly, the Court should decline to issue a certificate of appealability.

## X.   Conclusion and Recommendation

The undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **August 16, 2016**                        /s/ *Sheila K. Oberto*
                                                 UNITED STATES MAGISTRATE JUDGE